IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

CAMPBELL V. CAMPBELL

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

THOMAS OWAIS CAMPBELL, APPELLANT,

V.

MANAL OWAIS CAMPBELL, APPELLEE.

Filed July 14, 2026.    No. A-25-302.

Appeal from the District Court for Douglas County: TRESSA M. ALIOTH, Judge. Affirmed.

Kathryn D. Putnam, of Astley Putnam, P.C., L.L.O., for appellant.

Manal Owais Campbell, pro se.

RIEDMANN, Chief Judge, and BISHOP and WELCH, Judges.

BISHOP, Judge.

## I. INTRODUCTION

The Douglas County District Court dissolved the marriage of Thomas Owais Campbell and Manal Owais Campell. Thomas appeals, claiming that the district court incorrectly classified, valued, and allocated certain property and debts. He also claims that the court failed to retroactively modify alimony and account for "excessive alimony" in the overall division of assets and debts. Finally, Thomas claims the court erred regarding a motion to disqualify Manal's counsel and "disgorge" attorney fees paid to that counsel by Thomas. We affirm.

## II. BACKGROUND

Thomas met Manal, who is from India, on social media in 2015. They met in person for the first time in 2016 in Kuwait. After Manal came to the United States, the parties were married on November 17, 2016. They had two daughters, born in 2017 and 2021. During the marriage, Thomas was a self-employed attorney and Manal stayed at home with the parties' children.

- 1 -

Manal filed a "petition" for dissolution of marriage on November 1, 2021. She sought legal and physical custody of the parties' children, child support, an equitable division of the marital estate, alimony, and attorney fees. In his answer and "cross-complaint," Thomas sought legal and physical custody of the parties' children, a determination on child support, and an equitable distribution of the parties' property and debts.

On November 15, 2021, the district court entered an ex parte order stating that the parties were "mutually enjoined and restrained from transferring, encumbering, hypothecating, concealing, or in any way disposing of any real or personal property except in the usual course of business or for the necessaries of life, and upon further order of the court account for all unusual expenditures made after the entry of this order."

On November 22, 2021, the district court entered a "temporary order" granting Manal "temporary exclusive possession of the marital residence until such time that she moves from said residence," and until then, Thomas was ordered to temporarily pay any expenses associated with the marital residence. The court granted the parties joint legal custody of the children, with Manal having sole physical custody subject to Thomas' parenting time. Thomas was ordered to pay $5,234 (later recalculated to $5,155) per month for temporary child support and $2,000 per month for temporary spousal support beginning November 1. However, if Manal moved from the marital residence, Thomas' temporary spousal support would increase to $10,000 per month beginning the month following Manal's move from the residence; Manal moved out of the residence in December. The court ordered that, "Other than the marital residence which has been listed for sale, each party is restrained from selling, transferring, assigning, or otherwise hypothecating any marital property."

The parties filed numerous motions in this case, including various motions to compel, motions for sanctions, motions for contempt, motions to continue, motions for appraisal of real estate and for business valuation, and motions for order permitting sale of real property to pay taxes. We will discuss those motions as necessary later in our analysis when relevant to the issues on appeal.

On March 6, 2023, Thomas filed a "motion to disqualify [Manal's counsel] and disgorgement of fees." After a hearing on the matter, the district court denied Thomas' motion.

In an order filed on December 15, 2023, the district court appointed a receiver to assist the court in identifying, inventorying, and selling certain assets pending trial. The court noted that on June 28, Thomas pled guilty in federal court to one count of willfully making and subscribing a Form 1040 (Federal Income Tax Return) for the 2017 tax year. In November 2023, Thomas was sentenced to 12 months and 1 day in federal prison, and his sentence was to begin on January 29, 2024.

Thomas was ultimately disbarred. See *State ex rel. Counsel for Dis. v. Campbell*, 318 Neb. 23, 13 N.W.3d 97 (2024).

Thomas' temporary spousal support obligation was suspended on May 1, 2024.

Trial in the divorce proceeding was held on November 1 and 4, 2024. Both parties were present with counsel. Thomas and Manal both testified, as did other witnesses, and numerous exhibits were received into evidence. We will discuss the evidence as necessary later in our analysis.

On March 3, 2025, the district court entered a detailed 39-page decree (plus attachments) dissolving the parties' marriage. The court awarded the parties joint legal custody of their children, with Manal having primary physical custody subject to Thomas' specified rights of parenting time as set forth in the parties' partial mediated parenting plan. Thomas was ordered to pay Manal $734 per month in child support, retroactive to January 1, 2024. Thomas' spousal support obligation was determined to be satisfied as of May 1, 2024. The decree identified, valued, and divided the parties' property and debts, and Thomas was ordered to pay Manal $90,608.59 to equalize the marital estate.

Both parties filed motions to reconsider and/or to alter or amend. Each party's motion was granted in part and denied in part on April 8, 2025.

Thomas appeals.

## III. ASSIGNMENTS OF ERROR

Thomas assigns, reordered, that the district court erred (1) by failing to set off the proceeds from the sale of his premarital home as his nonmarital property, (2) by failing to apportion the appreciation in the marital home attributable to his nonmarital contributions, (3) by characterizing a loan held by Citizens State Bank as Thomas' nonmarital debt, (4) by failing to credit him with the reduction of the Citizens State Bank loan during the pendency of the proceedings, (5) by failing to offset Thomas' premarital real estate as his nonmarital property at its equity value, (6) by failing to account for the capital gains tax in the overall division of the assets and debts, (7) in its identification and valuation of the marital watch collection and/or failing to account for the same in the payment of the marital tax obligation, (8) in allocating the interest, penalties, and fees accrued for the 2021 taxes equally between the parties, (9) in determining the $50,000 gift from Manal's father was a nonmarital gift made only to Manal, (10) in failing to retroactively modify alimony and failing to account for the excessive alimony in the overall division of assets and debts, and (11) in overruling his motion to disqualify Manal's counsel and to disgorge the attorney fees he paid to that counsel.

## IV. STANDARD OF REVIEW

In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge in his or her determinations regarding custody, child support, division of property, alimony, and attorney fees. *Stava v. Stava*, 318 Neb. 32, 13 N.W.3d 184 (2024).

A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Seemann v. Seemann*, 316 Neb. 671, 6 N.W.3d 502 (2024).

When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Stava v. Stava, supra*.

When reviewing questions of law, an appellate court has an obligation to resolve the questions independently of the conclusion reached by the trial court. *Id.*

## V. ANALYSIS

### 1. DIVISION OF PROPERTY AND DEBTS

#### (a) General Propositions of Law

Neb. Rev. Stat. § 42-365 (Reissue 2016) provides for the "division of property as may be reasonable, having regard for the circumstances of the parties, duration of the marriage, [and] a history of the contributions to the marriage by each party," and, further, § 42-365 provides that "[t]he purpose of a property division is to distribute the marital assets equitably between the parties." See, also, *Stava v. Stava, supra*. There is no mathematical formula by which property awards can be precisely determined, but, generally, a spouse should be awarded one-third to one-half of the marital estate, the polestar being fairness and reasonableness as determined by the facts of each case. *Id.*

Equitable property division under § 42-365 is a three-step process. *Stava v. Stava, supra*. The first step is to classify the parties' property as marital or nonmarital. *Id.* The second step is to value the marital assets and determine the parties' marital liabilities. *Id.* The third step is to calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365. *Stava v. Stava, supra*.

Any given property can constitute a mixture of marital and nonmarital interests; a portion of an asset can be marital property while another portion can be separate property. *Id.* The burden of proof rests with the party claiming that the property is nonmarital. *Id.*

The extent to which the property is marital versus nonmarital presents a mixed issue of law and fact. *Id.* The manner and method of acquisition involve questions of fact, but the classification of the property under those facts is a legal question and not a matter of the court's discretion. *Id.* The second step, valuation, involves questions of fact, and the third step, dividing the marital estate in accordance with the principles of § 42-365, is a matter of discretion. *Stava v. Stava, supra*.

All property accumulated and acquired by either spouse during the marriage is, as a general rule, part of the marital estate. *Id.* Appreciation, be it active or passive, in the marital interest is always marital; it is simply part of the marital property. *Id.*

In contrast, property that a party brings into the marriage is usually excluded from the marital estate. *Id.* The equity in property at the time of marriage is a nonmarital asset which, if established, should be set aside as separate property. *Id.* This includes its passive appreciation. *Id.*

Separate property can become marital property under either "transmutation" or "active appreciation." *Id.* These two categories are mutually exclusive. *Id.* Transmutation converts an asset entirely from separate to marital and can occur through commingling if the separate property is inextricably mixed with marital property or with the separate property of the other spouse. *Id.* Active appreciation converts to marital property only the increase in a nonmarital asset's value due to a contribution of marital funds or efforts. *Id.*

#### (b) Thomas' Premarital Home

Thomas claims that the district court abused its discretion by failing to set off $203,763.24 from the sale proceeds of his premarital home on North 127th Street as his nonmarital property.

There is no dispute that Thomas acquired the home on North 127th Street prior to the parties' marriage. Exhibits received in evidence show that Thomas and his prior wife acquired the

North 127th Street home in September 2012. On December 21, 2015, there was a Deed of Trust on this property between Thomas and his prior wife and Bank of the West for a revolving line of credit, and "[t]he lien of this Deed of Trust shall not exceed at any one time $114,500." Thomas' prior wife transferred the property to him via quitclaim deed on December 20, 2017. Thomas' credit report shows that the only balances on this line of credit were in April, May, and June 2020, for a little over $110,000 during those months; a payment was made each month, and the account was closed in July 2020. A deed of reconveyance dated July 28, 2020, shows that the indebtedness secured by the Deed of Trust had been repaid.

Thomas testified that he used the premarital home as collateral when he took out a $110,000 loan to purchase the lot for the parties' marital home (the Bennington Property). Exhibits received into evidence show that the underlying lot for the parties' marital home was purchased in March 2020 for $117,500. As noted above, a balance first appeared on the revolving line of credit against the North 127th Street property in April in the amount of $110,785, and that revolving line of credit was paid in full and closed in July.

Apparently, around that same time in July 2020, a line of credit or loan was opened with Citizens State bank, secured by the North 127th Street home, in the amount of $111,167.31. (According to Thomas, this line of credit/loan was taken out for use on the Bennington Property). The line of credit/loan was reduced to $98,010.99 between July 2020 and July 2021, and that balance was paid in full on July 16, 2021. Thomas had sold the North 127th Street property on July 15 for $215,000. An exhibit received into evidence shows that Thomas received a wire transfer in the amount of $105,752.25 on July 15.

According to Thomas, he used the balance of proceeds from the sale of the North 127th Street home toward the approximately $160,000 he paid to close on the financing of his residential loan for the Bennington property. In evidence is a "Uniform Residential Loan Application" dated June 4 or 14, 2021, showing Thomas would need $159,513.74 "Cash" to close on a loan for the Bennington home.

Thomas requested that the district court offset as his premarital property the $98,010.99 that went to pay off the line of credit/loan, plus the $105,752.25 that was wire transferred to him that he put into the marital home.

In its decree, the district court found that Thomas met his burden to show that the North 127th Street home was premarital but found that only $98,010.99 of the proceeds were used to purchase the lot for the marital home. The court found that Thomas was entitled to an offset of $98,010.99. However, the court found that Thomas was not entitled to an offset for the remaining $105,752.25 because there was "no credible evidence to support a finding that the proceeds were used to close on the permanent financing" for the Bennington home.

Thomas argues that "his testimony and the documentary evidence established the tracing connection between the receipt of the proceeds from the sale of his premarital home, and the closing of the permanent financing on the marital home." Brief for appellant at 24.

Having reviewed the record, we cannot say that the district court abused its discretion in finding that there was "no credible evidence to support a finding that the proceeds were used to close on the permanent financing" for the Bennington home. The "documentary evidence" for the permanent financing on the marital home was only an "[a]pplication" completed by Thomas the month prior to the sale of the North 127th Street home. There is no documentary evidence (e.g.

wire transfer, check, et cetera) in the record showing that $105,752.25 from the sale proceeds of the North 127th Street home actually went towards closing on the permanent financing on the marital home. Although Thomas testified that he used the proceeds from the sale of his North 127th Street home to close on the permanent financing for the marital home, the court found the evidence was not credible. See *Scott v. Scott*, 319 Neb. 877, 25 N.W.3d 439 (2025) (when evidence is in conflict, appellate court considers and may give weight to fact that trial court heard and observed witnesses and accepted one version of facts rather than another). Therefore, we cannot say that the court abused its discretion when it determined that Thomas was not entitled to an offset of $105,752.25 from the proceeds of the sale of the North 127th Street home.

(c) Appreciation in Marital Home

Thomas assigns that the district court failed to apportion the appreciation in the marital home attributable to his nonmarital contributions. He claims that the marital home was valued at $1,101,623 upon its completion (according to his June 2021 loan application) and sold for $1,300,000 on November 22, 2024 (according to a receiver's report in the transcript; however, this report was dated after the trial, and no motion was made to reopen the evidence), and the appreciation was therefore $198,377. Because "[t]his was a brand-new home that the parties built," "all the improvements were made prior to closing and were part of the $1,101,623 value, making the appreciation entirely passive." Brief for appellant at 25. In his brief, Thomas set forth the cash contributions he made to the marital home, and the contributions made by the marital estate, to calculate and determine the percentage of the appreciation in the marital home he believed he was entitled to have set off to him.

However, at trial, the district court received Thomas' proposed balance sheet for the various matters (exhibit 231), which had been offered as an aid to the court. Nowhere in that exhibit was there any request for appreciation in the marital home to be attributable to Thomas' nonmarital contributions. At oral argument in this case, Thomas' counsel acknowledged that no request for that appreciation was made at trial. We will not consider an argument or theory raised for the first time on appeal, because a lower court cannot commit error in resolving an issue never presented and submitted to it for disposition. *White v. White*, 320 Neb. 256, 26 N.W.3d 924 (2025).

(d) Citizens State Bank Loan and Y Street
and Castelar Street Properties

Thomas assigns that the district court abused its discretion by (1) characterizing Citizens State Bank loan #xxxxx4455 (Citizens Bank loan #4455) as his nonmarital debt, (2) failing to credit him with the loan reduction during the pendency of the proceedings, and (3) failing to offset his premarital real estate as his nonmarital property at its equity value.

*(i) Evidence at Trial*

Citizens Bank loan #4455 was a loan in the name of 511 Propiedades, LLC (the LLC).

The LLC was started during the parties' marriage. Thomas testified that it was "just a holding" company for the parties' numerous rental properties, and he was the sole owner of the LLC at the time of trial. Two of the rental properties--the Y Street and Castelar Street properties--were owned by Thomas prior to the parties' marriage and were unencumbered at the

time of the marriage. According to Thomas, the Y Street property was pledged as collateral for a $225,000 loan from Citizens State Bank, and the money was used to purchase marital rental properties. The money owed on that note was paid off when the Y Street property was sold by the receiver. The Castelar Street property was also pledged as collateral for a note held by Citizens State Bank. Thomas initially did not recall what that money was utilized for, but was then asked, "[D]o you know why you would have encumbered an unencumbered piece of real estate during the marriage?" He responded, "To buy more property." He denied encumbering his real estate to build the marital home.

Exhibit 228 contains information about the parties' real estate, including properties in the LLC. In January 2019, the Y Street property was used to secure a $225,000 line of credit from Citizens State Bank; the "Deed of Trust" was issued by Thomas' Law Office to Citizens State Bank. On October 31, 2019, a "Warranty Deed" for the Y Street property was issued from Thomas' Law Office to the LLC. A "Deed of Reconveyance" dated February 28, 2020, states that "all-part of the indebtedness" secured by the 2019 Deed of Trust had been paid and all interest in the property was reconveyed.

In January 2019, the Castelar Street property was also used to secure a $225,000 line of credit from Citizens State Bank; the "Deed of Trust" was issued by Thomas' Law Office to Citizens State Bank. On October 31, 2019, a "Warranty Deed" for the Castelar Street property was issued from Thomas' Law Office to the LLC. A "Deed of Partial Reconveyance" dated February 15, 2024, states that "all-part of the indebtedness" secured by a 2020 deed of trust executed by the LLC had been paid and the Castelar Street property was reconveyed.

The LLC's statement for "Account xxxxx4455" shows an "Opening Advance" of $220,000 on March 15, 2021. Regular monthly payments were made from April 2021 through December 2023. A "Prin Pymt" of $119,684.12 was made on February 12, 2024. An interest payment of $1,490.05 and a "Closing Payment" of $63,918.11 were made on March 20; after the "Closing Payment," the account had a zero balance.

The title company's February 9, 2024, "Settlement Statement – Seller" for the sale of the Castelar Street property shows a payoff off of $119,684.12 "NET PROCEEDS to Citizens State Bank." And the title company's March 19 "Settlement Statement – Seller" for the sale of the Y Street property shows a $65,471.10 "Payoff of first mortgage loan to Citizens State Bank."

Thomas asked that the proceeds from the sales of the Y Street and Castelar Street properties be awarded to him as his nonmarital properties, and that he receive credit for the proceeds used to pay off the debt acquired during the marriage.

*(ii) Additional Evidence at Trial*

Because it is relevant to the district court's ruling, we set forth here some additional evidence from trial. Manal's counsel questioned Thomas about various monies spent in 2021. Thomas testified that he purchased an "old" and "very cheap" Range Rover for Manal's father but did not end up giving it to her father because "Covid happened" and her father did not come to the United States. Thomas could not remember what he did with the vehicle and "may have given it away." He then said, "I think a friend bought it," "I don't remember." During her testimony, Manal did not agree that Thomas purchased the Range Rover for her father. She said Thomas "bought it for his girlfriend," "the girlfriend contacted me."

Rosa Gomez (Rosa) was Thomas' girlfriend at the time of trial. Thomas said they were "friends" in 2021, but also said they started dating in 2021. That year he took her on a trip to Kansas City to watch the Chiefs, and he paid for the trip. He also took her to Hawaii for Christmas and paid for "everything."

Exhibit 152 contains credit card statements for a card in the name of Thomas and his law firm. According to Thomas, he and Manal both had access to this credit card in 2021. (Manal testified that she had to "ask" Thomas before she could make purchases on credit cards.) Manal's counsel asked Thomas questions about several purchases made on the credit card. When counsel asked Thomas about a charge made in Hawaii in December, Thomas' counsel made a relevance objection because the charge was made after the filing for the divorce. Manal's counsel said it went to "a dissipation of assets," and the district court overruled Thomas' objection. Credit card transactions for the airline tickets to Hawaii (in Thomas and Rosa's names) and for a hotel/resort were made in October. Manal's counsel continued to question Thomas about other trips taken and various credit card transactions. For a charge to the Kansas City Chiefs in October, Thomas testified that he and Rosa went with some friends, he paid for their tickets and "[t]hey paid me back."

Counsel's questioning of Thomas and exhibit 152 also reveal that in April 2021, Thomas purchased airline tickets for three different named individuals (Thomas also had airline tickets for the same trip as one of the named individuals). During his testimony at trial and his deposition testimony that was received into evidence, Thomas could not clearly recall who those three individuals were; he said one "could have been for a client" who would have paid him back in cash, and another one could have been an employee that had surgery in Mexico that he would have traveled with because she needed assistance. In September 2021, Thomas purchased airline tickets for himself and Rosa (flight departing to "SLC" on October 1), and there were several transactions in Salt Lake City, Utah, and various other locations in Utah beginning October 1. Also in October, Thomas purchased airline tickets for himself and Rosa (flight departing to "MIA" on November 2; later transactions show flights to same location departing October 29 and 30); and airline tickets for himself and Rosa (flight departing to "SLC" on November 24). Thomas testified that he took trips to Miami, Florida, and Utah in November; credit card transactions in Miami start on October 30. In October and November, airline tickets were also purchased for "Gomez Perez/Tib." When asked who Gomez Perez was, Thomas responded, "I don't know," "that's a very common name." (However, we note that in his deposition testimony, Thomas said, "I think that's Rosa's mom, but I'm not sure.") And when asked if he made that transaction, Thomas replied, "Apparently."

In addition to trips, exhibit 152 shows numerous credit card transactions at places like Prada and Louis Vuitton. In his testimony at trial and in his deposition testimony, Thomas said that he made purchases at those stores, but that Manal did as well. However, Manal denied having any clothing from those stores. She "was shopping at Target," and the children had clothes from Target and Carter's.

### (iii) District Court's Ruling

The district court found that Thomas met his burden to show that he owned the Y Street and Castelar Street properties prior to the parties' marriage and that these two properties were unencumbered at the time of the marriage. He was therefore entitled to an offset in the equity of

those properties as his nonmarital property. However, the court had to determine the amount of that equity. In doing so, the court found that the two properties were encumbered by Citizens Bank loan #4455 at the time they were sold. The original loan of $220,000 was taken out on March 15, 2021, and although Thomas testified that the money was used to acquire or improve other marital properties, "[t]here was no credible evidence introduced to show properties were purchased or improved for $220,000 between March 15, 2021[,] and November 1, 2021." The court stated evidence was adduced that Thomas "was traveling extensively and making extensive purchases." The court found that Citizens Bank loan #4455 "was not a marital loan that was obtained for the benefit of the parties."

For the Castelar Street property, the district court noted that it was sold in February 2024 for $134,993.80, and closing costs were $15,309.68. Thomas "was entitled to receive proceeds of $119,684.12 from the sale as his nonmarital asset." "However, due to his nonmarital loan encumbering Castelar, the $119,684.12 proceeds were paid to Citizens Bank toward the payment of the #x4455 nonmarital loan."

For the Y Street property, the district court noted that it was sold in March 2024 for $121,000, and closing costs were $13,570.53, "leaving net proceeds of $107,429.47 that [Thomas] claims should be awarded to him as his nonmarital asset." Thomas "is entitled to an offset of $41,958.37 for his premarital equity in Y Street." "To determine this amount, the Court used the sales price of $121,000 less the closing costs of $13,570.53 less the balance due on the nonmarital loan #4455 of $65,471.10."

*(iv) Did District Court Abuse Its Discretion?*

a. Citizens Bank Loan #4455

First, Thomas claims that the district court abused its discretion by characterizing Citizens Bank loan #4455 as Thomas' nonmarital debt. He argues that the loan was taken out during the marriage and therefore Manal had the burden to prove that it was not used for a marital purpose. "To determine whether Manal has met her burden, the history of the commercial loan is important." Brief for appellant at 29.

Thomas claims that the parties took out a $225,000 line of credit in January 2019. He then claims that "[i]mmediately following the issuance of this line of credit, the parties purchased real estate, first in their own names, and later in the name of [the LLC]." *Id.* According to Thomas, the 2019 line of credit was renewed on February 13, 2020, and again on March 15, 2021, but "there is no evidence that new money was distributed." *Id*. He contends:

> The $225,000 line of credit issued in 2019 was paid off when the 2020 line of credit was issued, as the Deed of Trust was released concurrent with the opening of the lien in [the LLC's] name. The 2020 line of credit is the same line of credit that became Citizens #x4455, as that is the Deed of Trust that was released once Citizens #x4455 was paid in full.

*Id.*

Although Thomas claims that the parties immediately purchased real estate after taking out a $225,000 line of credit in January 2019, the evidence cited does not support his claim. He cites warranty deeds dated June to December 2019, showing the acquisition of various properties;

however, there is no documentary evidence in the record showing what monies were used to purchase the various properties. Nor is there any documentary evidence showing an outstanding balance on the line of credit in 2019. The only documentary evidence of a balance on a line of credit is the LLC's statement for Citizens Bank loan #4455 showing an "Opening Advance" of $220,000 on March 15, 2021. The district court found "[t]here was no credible evidence introduced to show properties were purchased or improved" for that amount after March 15. Based on the record before us, that finding by the district court does not constitute an abuse of discretion.

Thomas contends that "Manal made no effort to show that the credit line was used for a non-marital purpose." Brief for appellant at 30. We disagree. Manal put into evidence credit card transactions for 2021. While not all transactions were made by Thomas for a nonmarital purpose, there were several transactions after March 15, 2021, that were clearly not for the joint benefit of the parties (e.g. trips with Rosa). See *Vanderveer v. Vanderveer*, 310 Neb. 196, 964 N.W.2d 694 (2021) (marital debt includes only those obligations incurred during marriage for joint benefit of parties). The district court stated that evidence was adduced that Thomas was "traveling extensively and making extensive purchases," and it found that Citizens Bank loan #4455 was not a marital loan that was obtained for the benefit of the parties. Based on the record before us, that finding by the district court does not constitute an abuse of discretion.

Second, Thomas claims that the district court abused its discretion in failing to credit him with the reduction of Citizens Bank loan #4455 during the pendency of the proceedings. This claim presumes that the loan was a marital debt. However, because the loan was determined to be Thomas' nonmarital debt, he is not entitled to credit for a reduction of the loan during the pendency of the divorce proceedings.

### b. Y Street and Castelar Street Properties

Thomas argues that the district court abused its discretion when it failed to offset his premarital real estate--the Y Street and Castelar Street properties--as his nonmarital property at its equity value. He notes that the properties were unencumbered when the parties married, and the receiver sold the Castelar Street property for $134,000 and the Y Street property for $121,000. Thomas claims he was entitled to an offset of $134,000 and $121,000 for his equity in the Castelar Street and Y Street properties, respectively. "The only encumbrance against these properties at the time of sale was the Citizens Bank loan #x4455 which Thomas rightly contends was a marital debt." Brief for appellant at 32.

In its decree and balance sheet, the district court did set off the Y Street and Castelar Street properties to Thomas as his nonmarital properties, and the balance sheet lists the two properties at their 2024 sale values--$134,000 for Castelar Street and $121,000 for Y Street. However, to determine the "net proceeds" that should be setoff to Thomas for each property, the court took into account the sales proceeds used to pay off Citizens Bank loan #4455. Because the loan was determined to be Thomas' nonmarital debt, the district court did not abuse its discretion in accounting for such in determining the "net proceeds" to be setoff to Thomas for the two properties.

(e) Capital Gains

Thomas assigns that the district court abused its discretion by failing to account for the capital gains tax in the overall division of the marital assets and debts. In the argument section of his brief, he focuses on the sale of rental properties. He claims that his "tax attorney, Mr. [Benjamin] Heidinger, testified about the capital gains that would result from the sale of these properties," and "[a] spreadsheet setting forth his calculations was received into evidence." Brief for appellant at 34.

The spreadsheet, exhibit 255, was received into evidence at trial during Heidinger's testimony. However, the spreadsheet was not created by Heidinger. Rather, the spreadsheet was created by a third party that Thomas attempted to have testify at trial as an expert, but that person's testimony was stricken from the record after the district court realized the witness was never disclosed and that no motion for expert designation was filed.

After the other witness' testimony was stricken, Thomas called Heidinger to testify about capital gains. Heidinger explained that

> [a] capital gain is the tax liability that results from the sale of either real or personal property, and many times, there are considerations that go into calculating the ultimate tax due whether there was previous depreciation, costs associated with the improvement of the property, costs associated with the sale or purchase of the property, and also improvements to the property.

The "main places that [he] would start looking" for the information needed to prepare an estimate of the capital gains resulting from the sale of specific real estate are the Schedule D of a prepared tax return or the "purchase and sale documents," and the tax returns have information regarding depreciation.

Heidinger said that in this case he was provided closing statements for 10 properties, tax returns, and a spreadsheet (exhibit 255) that showed the calculations of the capital gains. He was asked if he had ample time to review the spreadsheet to confirm whether the data inputs set forth in that calculation reconciled with the materials he had reviewed. Heidinger replied, "I wasn't able to go through everything, but from what I was able to go through, I did find that any information I looked at in the spreadsheet did correspond to source documentation, which would be those closing statements or tax returns."

Heidinger explained how to calculate a capital gain of the sale of real estate:

> The first thing you would need to know is the sales price. From there, you would deduct what is the original cost of the property or cost basis of the property, and that gets you your starting net profit. From there, you would want to know if there were any improvements to the sale -- or improvements to the property. Those improvements to the property would increase the cost basis and reduce any net profit that would be taxable. From there, you would use that figure to determine the capital gains taxes due.
>
> . . . .
>
> . . . [I]f there were depreciation that were taken on on [sic] any of this property, you would take the tax rate, which is 25 percent, and multiply that by the amount of depreciation taken in the past to determine the depreciation recaptured.

The prior year's tax return can be used to determine what the recapture may be; it would be on a Schedule E if it was a rental property, or it would be in the statements attached to a tax return or an asset list if it was associated with some other part of the tax return. The depreciation taken on the properties was reflected in the capital gain calculation chart. Other information helpful to know in calculating a capital gains tax includes how long the property has been held, and if there was "any other income that would cause the total income of the tax return to rise above a certain threshold depending on the individual's filing status to determine whether a net investment tax was also applicable." Heidinger was able to ascertain those answers by looking at the prior tax returns. He was also able to extrapolate that data and reach a conclusion as to the expected capital gains for the sale of the properties. "I was able to determine that the spreadsheet accurately calculates the tax based on the recapture and capital gains as well as state tax for those ten properties." The calculation of capital gains is a "fixed formula," and there is no discretion to determine what the tax will be.

According to Heidinger, if the parties have a joint tax obligation for any particular year, "[t]the IRS determines that both spouses are liable for the full amount, and it is a joint and several liability." No order by the district court would impact the IRS' power "to collect or make a determination about who it could collect from."

In its decree, the district court noted Heidinger's testimony that "[he] wasn't able to go through everything, but from what [he] was able to go through, [he] did find that any information [he] looked at in the spreadsheet did correspond to source documentation, which would be those closing statements or tax returns." The court found that it "cannot make a finding as to capital gains based on an estimate that was admittedly not thorough."

Thomas argues that "[t]o ignore the inevitable tax consequences from the liquidation of marital assets is an abuse of discretion as it is a joint obligation, the properties have been sold, and the gains were calculated using a standard formula and testified to at trial by a tax expert." Brief for appellant at 34.

As stated previously, Heidinger did not prepare the spreadsheet calculating the estimated capital gains taxes for the various properties. When asked if he had ample time to review the spreadsheet to confirm whether the data inputs set forth in that calculation reconciled with the materials he had reviewed, Heidinger replied, in relevant part, "I wasn't able to go through everything." Because Heidinger's review of the estimate was admittedly not thorough, we cannot say that the district court abused its discretion when it did not include the capital gains tax in the overall division of the assets and debts.

(f) Watches

Thomas assigns that the district court abused its discretion in its identification and valuation of the marital watch collection and/or failing to account for the same in the payment of the marital tax obligations.

Thomas was a watch collector, and he bought, sold, and traded numerous luxury watches during the parties' marriage and throughout the pending divorce proceedings. Thomas estimated that it was "[p]robably" more than 20 watches. The parties produced testimony and documentary

evidence regarding the various watches, which included brands like Rolex, Vacheron Constantin, Paneri, Audemars Piguet, Patek Philippe, and A. Lange & Söhne.

In its decree, the district court found, "The volume of trading created a great deal of uncertainty as to which wristwatches existed on the date the divorce was filed," and Thomas "continually traded and purchased wristwatches in violation of this Court's order." The court found that based on the testimony and evidence, Thomas owned the following watches, which were included in the balance sheet for the valuation and division of the parties' assets:

1. Panerai Luminor #x0313 with a value of $10,584; E203[.]

2. Panerai Submersible Luna Rossa #x6081 with a value of $21,600; E204[.]

3. A. Lange & Sohne Datograph Up/Down SN: 239215 with a value of $152,500. The Court acknowledges that [Thomas] claims to have sold this watch but finds the receipt provided unreliable.

4. A. Lange & Sohne Odysseus SN: 251497 with a value of $30,900; E207[.]

5. An unidentified watch that [Thomas] acknowledged trading in on 12/1/2021 for $3200 and purchasing A. Lange & Sohne Saxonia Moon Phase 40MM SN:244141 for $33,200; E208[.]

6. A. Lange & Sohne 1815 Up/Down 39.5MM $31,800. E212. [Determined to be nonmarital, having been purchased on March 1, 2023.]

7. A. Lange & Sohne 1 Time Zone $50,000. E210.

8. A. Lange & Sohne 1815 Annual Calendar $40,000. E198.

(Emphasis omitted.) Thomas was awarded the wristwatch collection set forth above.

In its orders on the parties' motions to reconsider and/or to alter or amend, the district court addressed the A. Lange & Sohne 1 Time Zone watch, "#252076." The court "reaffirm[ed] its order to utilize a valuation date of December 1, 2021[,] to identify and value the watches comprising the marital estate," and found that this watch was purchased on December 1, 2021, at a value of $125,000. The court found: "[Thomas] admitted to still owning the same wristwatch and provided a receipt showing purchase of this wristwatch in the amount of $125,000 in Exhibit 124. [He] offered Exhibit 206 as a corrected receipt which advised the watch was sold . . . which clearly contradicts his testimony and Exhibit 210."

In his brief, Thomas states, "Two watches are at issue in this appeal, the A. Lange & Sohne Datograph Up/Down No. 239215 and the A. Lange & Sohne 1 Time Zone No. 252076." Brief for appellant at 35.

*(i) Datograph*

At trial, Thomas testified that he purchased the A. Lange & Sohne Datograph Up/Down, serial number 239215, in May 2021 for $150,000. Exhibit 205 is a receipt from "Burdeen's Jewelry" showing that Thomas purchased a "Datograph Up/Down 41MM Pink Gold SN: 239215" with diamonds for $152,500 in May 2021. Thomas said he sold this watch for $125,000 "to pay for taxes." No exhibit shows that Thomas sold this wristwatch with this serial number.

However, Thomas claimed that exhibits 124 and 206 evidenced the sale of the Datograph wristwatch, but "Gabriel," the New York broker, "messed up" and both receipts were incorrect. Exhibits 124 and 206 are receipts from "Watches Off 5th" in New York regarding the "A. Lange

- 13 -

& Sohne 1 Time Zone watch; Case No. 252076." Exhibit 124 is a bill of sale dated April 28, 2022, stating that the watch was sold to Thomas for $125,000. Exhibit 206 is a "revised" receipt "due to incorrect wording," and states that the watch was purchased from Thomas for $125,000. Both receipts state, "These terms were agreed to in November 2021, and payment was made in December 2021." Thomas testified that "Gabriel" typed Time Zone on the receipts, "but it's not accurate." "I didn't sell" the Time Zone watch, "[a]nd it's not worth that amount of money either." Thomas said he sold the Datograph with diamonds to "Gabriel" for $125,000 in 2021, "right around the same time as the divorce," "to pay for taxes."

According to Thomas, he received the $125,000 from the sale of the watch via a "wire" and used approximately $99,000 of that money to make payments towards the parties' 2020 federal taxes. To support his claim that he used the $125,000 in sale proceeds to pay taxes, exhibits were received showing that his law firm's checking account received a "Wire In Domestic" for $125,000 on December 6, 2021, and made ACH Payments to "IRS USATAXPYMT" for $80,000 on December 9, and $4,268.50 and $15,000 on December 30.

In his brief, Thomas argues that the district court abused its discretion when it "found that Thomas was to be awarded the Datograph at a value of $152,000, and simultaneously, gave him no credit for the payment of $99,268.50 toward the parties' joint tax debts." Brief for appellant at 36. Even though Thomas would contend that the fair market value of the watch was its sale price of $125,000, "[i]t would not be an abuse of discretion for the Court to find that Thomas owned the Datograph on December 1, 2021, and assign it a value of $152,000." *Id.* "However, if the watch was awarded to Thomas, then it also must hold that he used his nonmarital funds to pay the $99,268.50 in tax payments after December 1, 2021, and give him credit for paying that marital debt with his nonmarital money." *Id.* "To both find that he retained the watch and made the tax payment with marital money counts the same asset twice in the balance sheet, and that is an abuse of discretion." *Id.* at 36-37.

Based on our review of the record, we find the district court did not abuse its discretion in awarding the Datograph to Thomas at a value of $152,500. Although Thomas claimed he sold the watch, no receipt showed the sale of the Datograph with this serial number, and the court found that the sales receipt that Thomas did provide was unreliable. See *Scott v. Scott*, 319 Neb. 877, 25 N.W.3d 439 (2025) (when evidence is in conflict, appellate court considers and may give weight to fact that trial court heard and observed witnesses and accepted one version of facts rather than another).

We also cannot say that the district court abused its discretion when it did not give Thomas credit for $99,268.50 in allegedly nonmarital monies used to pay the parties' tax obligation. In its decree, that district court stated that the parties filed their 2020 taxes on October 15, 2021, the tax obligation was a "joint debt," and the taxes were paid in full by January 28, 2022. The balance sheet incorporated and attached to the decree (legible in the order nunc pro tunc) says that the 2020 taxes were "[a]ll paid with marital funds." We cannot say the district court's finding was an abuse of discretion.

*(ii) Time Zone*

At trial, Thomas testified that he still owned the Time Zone watch. According to exhibit 210, Thomas purchased the watch by trading in two other watches (one valued at $22,000 and the

other valued at $12,000) and paying $17,000 via wire transfer on April 4, 2022. The Time Zone was the same watch that was mentioned in the allegedly "messed up" receipts discussed previously with respect to the Datograph watch.

In the orders on the parties' motion to reconsider and/or alter or amend, the district court found that Thomas admitted that he still owned the Time Zone watch. The court further found that this watch was purchased on December 1, 2021, at a value of $125,000.

Thomas argues that the district court abused its discretion in finding that he purchased the A. Lange & Sohne 1 Time Zone, No. 252076, in December 2021 for $125,000. Thomas claims he purchased the Time Zone from Watches Off 5th on April 4, 2022, for $50,000. "No evidence has ever been adduced that shows that Thomas purchased anything in December 2021 for $125,000," other than "an erroneous receipt that was prepared at Thomas' request in April 2022" that "appeared to amalgamate two transactions." *Id.*

Given the contradictory evidence provided by Thomas regarding when he purchased the Time Zone watch and for how much money, we cannot say that the district court abused its discretion in finding that he purchased it on December 1, 2021, for $125,000. See *Scott v. Scott, supra*.

(g) Taxes, Interest, and Penalties

In its decree, the district court found that the 2020 and 2021 state and federal tax debts were a marital obligation to be paid equally by the parties, including the penalties and interest from 2021.

Thomas assigns that the district court abused its discretion in allocating the interest, penalties, and fees accrued for the 2021 taxes equally between the parties. He argues that he should not be responsible for the late fees, penalties, or interest on the parties' 2021 tax liability because "the parties had marital funds available to pay the tax debt throughout these proceedings and Manal objected to using the proceeds from the sale of real estate to pay the joint tax debt in bad faith." Brief for appellant at 39. "As her bad faith objection is the reason the tax debts were not timely paid and that interest and penalties accrued, Manal should be solely liable for the interest and penalties." *Id.*

During the divorce proceedings, Thomas sought permission to sell real estate to pay taxes. In his April 2022 motion, Thomas claimed his income taxes for 2021 had been prepared and he had been informed that the parties would owe "approximately $300,000 in taxes." Manal opposed Thomas' motion to permit the sale of real estate to pay taxes, claiming that Thomas had not yet provided her with the relevant documents and information showing the actual value of the real estate and verifying the tax debts owed. The district court denied Thomas' motion for permission to sell the real estate. When Thomas filed a motion to reconsider in July 2022, Manal once again objected to his motion. She noted that in his previous motion Thomas alleged that the 2021 taxes would be approximately $300,000, but in sworn affidavits from May 2022 (attached to her objection) he alleged a tax liability of $500,000 and his accountant alleged a tax liability estimate of $534,607; "so we do not in fact know what is owed." According to the court's August 2022 order, the parties stipulated that five properties could be sold, and the funds transmitted to the Clerk of the Court.

- 15 -

In October 2022, Thomas filed a motion for an order permitting the use of sale proceeds to apply to marital income taxes. At a hearing, Manal argued that Thomas kept talking about taxes owed, but "I haven't seen 1099s," "I haven't seen W-2s." The district court stated that no documentation had been provided "as to what these tax debts are," and Thomas was "premature in that only one of the properties has actually sold." The court denied Thomas' motion "at this time," and said he could refile it when there was "some kind of evidence." In November, Thomas filed a motion to reconsider. At a hearing, Thomas provided affidavits from his accountant and tax attorney regarding the tax debt owed for 2021 and the accumulating interest and penalties, and he provided his own affidavit detailing Manal's opposition to the utilization of funds and his belief that she was delaying the proceedings. The court noted that the "debt and the interest and everything that's coming is a marital debt." But the court's concern was not "having a clear picture at trial of what everything is here." "I continually see income and exhibits of [Thomas] spending money on $100,000 watches and things while he's coming before this Court asking for the release of these funds." Thomas "continually comes before this Court" "wanting the money from the properties when he sold assets he was ordered not to" and that money "is not accounted for as to where it went." "That's where the Court's concern comes from in not having everything -- [Manal] not having received everything to know are we just trying to remove these funds so that these are gone so now this tax debt is taken care of?" "If you're going to come in at the trial and ask the Court go from the date of separation or the date of filing, he's depleted the marital estate." Thomas' motion to reconsider was denied.

Based on our review of the record, it appears that there were discovery issues attributable to Thomas, and his actions during these proceedings complicated the financial picture of the marital estate. Accordingly, we cannot say that the district court abused its discretion in allocating the interest, penalties, and fees accrued for the 2021 tax year equally between the parties.

### (h) $50,000 Gift From Manal's Father

Thomas argues that the district court abused its discretion in determining that a $50,000 gift from Manal's father was a nonmarital gift made only to Manal.

Generally, all property accumulated and acquired by either spouse during a marriage is part of the marital estate. *Dooling v. Dooling*, 303 Neb. 494, 930 N.W.2d 481 (2019). Exceptions include property that a spouse acquired before the marriage, or by gift or inheritance. *Id.* The burden of proof rests with the party claiming that property is nonmarital. *Id.*

Manal testified that she and Thomas had a wedding ceremony in India in August 2016, and they came to the United States in September. She said, "[M]y father gave me $50,000 because I came -- like, it's a culture thing where my dad gives me money for my -- when we got married here," "[a]nd it was for my future for a securement." The money was given to her when she came to the United States. It was a gift for her, but "it went to Mr. Thomas." Manal explained that the money was transferred to Thomas' bank account "because at that time, I didn't have any accounts." In Manal's culture "the house is run by man." Manal stated that Thomas "wanted to buy a[n] office building," "[s]o he approached me if I can borrow the money." "So I gave him -- I said okay, and then he applied to that office building."

Thomas testified that the $50,000 from Manal's father was a "marital gift." Thomas "spoke to her father personally about the purchase" of the building for his law office (South 24th Street),

and the gift "was for us for the marriage." The money was wired into the parties' marital bank account.

Thomas was confronted with his deposition testimony from May 4, 2023, which was received into evidence. In his deposition, Thomas stated that the money was given to Manal "[b]ecause of the marriage." "[Her father] didn't give me any money," "[t]he money was given to Manal, and Manal gave me the money." Later in the deposition, Thomas was asked if the $50,000 was a gift to Manal alone or to them jointly, and he responded, "I don't know." In his deposition, Thomas also stated that the money "has been paid back to Manal" because of all the alimony he had to pay her.

In the decree, the district court found that the money "was a gift" to Manal and that she was entitled to a payment of $50,000 "off the top" from the proceeds of the sale of the South 24th Street property.

Thomas argues that "Manal did not establish by a greater weight of the evidence that the gift was intended for [her] alone." Brief for appellant at 27. And that "[e]ven if the court found Thomas' testimony lacked credibility on this issue, Manal still provided no evidence that would allow her to carry her burden of proof on this issue, and her own testimony at times suggested it was intended as a loan, not a gift at all." *Id.* at 28.

Based on our review of the record, we find there was evidence that Manal's father gifted her $50,000, and that she loaned the money to Thomas for the purchase of his office building. Accordingly, we find the district court did not abuse its discretion in determining that the $50,000 was a gift to Manal. See *Scott v. Scott*, 319 Neb. 877, 25 N.W.3d 439 (2025) (when evidence is in conflict, appellate court considers and may give weight to fact that trial court heard and observed witnesses and accepted one version of facts rather than another).

## 2. ALIMONY

Thomas argues that the district court "abused its discretion in failing to retroactively modify alimony and failing to account for the excessive alimony in the overall division of assets and debts." Brief for appellant at 41.

In dividing property and considering alimony upon a dissolution of marriage, a court should consider four factors: (1) the circumstances of the parties, (2) the duration of the marriage, (3) the history of contributions to the marriage, and (4) the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of each party. *Scott v. Scott, supra*. In addition to the specific criteria listed in § 42-365, a court should consider the income and earning capacity of each party and the general equities of the situation. *Scott v. Scott, supra*.

The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances make it appropriate. *Id.* In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or a just result. *Id.* The ultimate criterion is one of reasonableness. *Id.* An appellate court is not inclined to disturb the trial court's award of alimony unless it is patently unfair on the record. *Id.*

- 17 -

In this case, Manal moved to the United States and married Thomas in 2016. During the marriage, Manal stayed home with the parties' children, while Thomas earned a substantial income as a self-employed attorney. Manal filed for divorce in November 2021.

Beginning on November 1, 2021, Thomas was ordered to pay Manal temporary spousal support in the amount of $2,000 per month; however, if Manal moved from the marital residence, Thomas' temporary spousal support would increase to $10,000 per month beginning the month following Manal's move from the residence. Manal moved out of the residence in December.

Thomas requested a modification of his temporary alimony two times prior to trial. In December 2022, Thomas requested that his alimony obligation be terminated or modified. In its January 2023 order, the district court stated that Thomas' request to review the temporary alimony award was reserved to the time of trial, and "[i]f the alimony award is determined to have been excessive at the time this motion was filed, the Court may consider this in the overall division of the assets and debts of the parties."

In December 2023, Thomas requested that his alimony obligation be terminated in light of the fact that he had been sentenced to 1 year in federal prison and had to report at the end of January 2024, and "[a]t a minimum, [his] law license will be immediately suspended." In its December 2023 order, the district court continued the issue of support to February 14, 2024. Any findings in the December 2023 order regarding Thomas' ability to generate an income to pay various financial obligations was addressed in the context of the necessity of appointing a receiver to authorize the sale of assets in Thomas' "absence." Following a hearing in February 2024, the court entered an order in March denying Thomas' motion to modify support. The court stated, "A further hearing on this motion may be had once the Receiver has conducted a further investigation into the bank accounts of [Thomas'] Law Office and other potential income sources of [Thomas]."

At a hearing on April 29, 2024, the parties agreed to stay or suspend alimony as of May 1 until the time of trial. The district court said a "stipulated order was fine." An entry in the "Judges Notes" for May 1 states, "Stipulated Order signed."

At trial, tax returns were received into evidence. The parties' 2020 tax return reflects an adjusted gross income of $928,463. Thomas' 2021 tax return reflects an adjusted gross income of $1,219,154, and his 2022 tax return reflects an adjusted gross income of $1,500,128.

Manal testified that she obtained employment at a daycare in September 2022. She subsequently enrolled in a nursing program in March 2023, the total cost of which was $15,000 to $20,000.

The receiver testified that he "did not discover" any income by Thomas after the receiver was appointed in December 2023. Thomas testified at trial that he was currently working as a paralegal earning $30 per hour.

In its decree, the district court stated that Thomas' alimony obligation "shall be terminated as of May 1, 2024, the date which the Court suspended alimony payments." The court found that it was reasonable to leave the alimony support order through May 1, and that Thomas paid alimony for approximately one-half the length of the marriage.

Thomas contends that the alimony award was excessive after December 2022, and that it was an abuse of discretion to continue the alimony award after December 15, 2023, when he stopped having an income stream. He argues "[t]he circumstances warrant both a retroactive

termination of alimony to December 31, 2023, and a retroactive modification to $5,000 per month effective December 31, 2022." Brief for appellant at 44.

However, we cannot say that the district court abused its discretion in terminating alimony as of May 1, 2024. The alimony award was not patently unfair on the record and it will not be disturbed. See *Scott v. Scott, supra* (appellate court not inclined to disturb trial court's award of alimony unless it is patently unfair on the record).

### 3. MOTION TO DISQUALIFY COUNSEL AND DISGORGE ATTORNEY FEES

On March 6, 2023, Thomas filed a "motion to disqualify [Manal's counsel] and disgorgement of fees" that Thomas had been ordered to pay that counsel during the proceedings.

A motion to disqualify an attorney is addressed to the discretion of the trial court, whose findings will not be disturbed absent evidence of abuse. *McCully, Inc. v. Baccaro Ranch*, 279 Neb. 443, 778 N.W.2d 115 (2010), *abrogated on other grounds, State v. Ezell*, 314 Neb. 825, 993 N.W.2d 449 (2023).

A hearing was held on Thomas' motion on March 29, 2023. Thomas argued that his former attorney from his criminal investigation for tax evasion (who was also his friend) had extensive communication with Manal during the divorce proceeding and relayed confidential information to her, particularly about items that Thomas sold during the divorce, namely an airplane and a watch. Thomas argued that Manal, in turn, relayed that information to her divorce attorney. He claimed that the information, which would otherwise not have been obtained prior to discovery, was used to file various motions in the divorce case. Thomas argued that Manal's counsel should be disqualified. (Thomas did recognize his former attorney's deposition testimony, wherein the attorney stated he was helping Manal and her parents with an immigration case during the parties' divorce proceedings, but Thomas still claimed the timing of various communications did not "add[] up.")

In response, Manal argued that Thomas had not shown anything that was supposedly confidential or any information that was actually provided to Manal or her counsel. She claimed that the serial number on the airplane was observable in a photograph, and that number could be used to see if the airplane was listed for sale. Additionally, Manal communicated with the wristwatch company and Thomas provided the bill of sale for the watch to Manal and her counsel.

Exhibits were received into evidence at the hearing, including the parties' affidavits and the deposition testimony of Thomas' former attorney. In the former attorney's deposition testimony, he testified about his various communications with Manal. According to the attorney, Manal found out about the sale of the airplane and the watch directly from Thomas.

In its order on April 12, 2023, the district court denied the motion to disqualify. The court stated:

> While the evidence offered by [Thomas] demonstrates some troubling actions by [his former attorney], the Court does not see how those actions justify disqualifying [Manal's attorney]. [Thomas'] Motion seeks to disqualify [Manal's attorney] and appoint a special master to review [her attorney's] files to ensure that no confidential information is transmitted to substitute counsel. This is peculiar because [Thomas'] allegations do not directly involve [Manal's attorney] receiving confidential information. Instead, [Thomas] alleges that the confidential information was indirectly provided to [Manal's attorney] by

- 19 -

[Manal]. In this sense, the Court is unable to see how removing [Manal's attorney] would remedy the problem alleged. If the Court were to remove [the attorney] and [Manal] hired substitute counsel, there would be nothing to stop [Manal] from simply divulging the same information. . . . The Court finds that the purported sharing of privileged information . . . by [Thomas' former attorney] to [Manal] does not justify the disqualification of [Manal's attorney]. [Thomas] fails to meet the high burden imposed upon a party seeking to disqualify opposing counsel.

Thomas argues that Manal's attorney "did receive confidential information warranting his disqualification for the case." Brief for appellant at 46. He also claims that Manal's attorney "should have known of the conflict [of interest] when [Manal] perjured herself in October 2022 stating she did not have conversations with [Thomas' former attorney]," statements her attorney "knew to be . . . false." *Id.* 47.

However, upon our review of the record, it appears that Manal's statements in October 2022 about not having had conversations with Thomas' former attorney were in reference to the time around the 2020 raid on the parties' home and Thomas' office (related to his tax case). Additionally, there was evidence in the record to suggest that Manal did not learn about Thomas' sale of an airplane and watch from Thomas' former attorney. Accordingly, we cannot say that the district court abused its discretion in denying Thomas' motion to disqualify and for disgorgement of fees.

### 4. MANAL'S REQUESTED CUSTODY MODIFICATIONS

In her brief, Manal asks this court to modify the custody provisions to (1) grant her sole authority to apply for and renew the children's passports and (2) permit her 22 consecutive days of summer parent time in India each year, or at least in alternate years. Manal did not file a cross-appeal assigning error to the district court's decree. Generally, an appellee may not question a portion of a judgment at issue on appeal unless the appellee properly raises the issue by filing a cross-appeal. *Humphrey v. Smith*, 311 Neb. 632, 974 N.W.2d 293 (2022). See, also, *DH-1, LLC v. City of Falls City*, 305 Neb. 23, 938 N.W.2d 319 (2020) (city failed to file cross-appeal and therefore issue not properly before court).

### VI. CONCLUSION

For the reasons stated above, we affirm the district court's March 3, 2025, decree, as amended by the court's April 8 orders on the parties' motions to reconsider.

AFFIRMED.